E-FILED
Monday, 20 March, 2023  03:32:50 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| WAYNE PATTERSON II, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.  1:20-cv-01073 |
| ) | |
| McLEAN COUNTY SHERIFF JON ) | |
| SANDAGE, ) | |
| ) | |
| Defendant. ) | |

## ORDER & OPINION

This matter is before the Court on cross-motions for summary judgment filed by the remaining plaintiff, Wayne Patterson II (doc. 63), and the remaining defendant, the office of the McLean County Sheriff (doc. 61). Both motions are fully briefed and ready for disposition. For the following reasons, the Court grants summary judgment for Defendant on the sole remaining count, denies Plaintiff's Motion for Summary Judgment, and orders this case be terminated.

### BACKGROUND

In 2020, Plaintiff (and his father, later dismissed from the case) brought suit against various individuals and entities associated with the McLean County Sheriff, alleging that on several occasions he—a black man—was arrested by law enforcement in the Bloomington-Normal area, while similarly situated white women were allowed to go free. (Doc. 1). At this stage in the proceedings, a single claim against a single defendant remains: that when sheriff's deputies, motivated by a discriminatory policy and practice, detained Plaintiff and conspired with the Bloomington Police

Department to have him arrested on gun charges—while two white women living with him in the home where the gun was located were neither detained nor arrested—the McLean County Sheriff violated Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination by recipients of federal funding. Plaintiff asserts he is entitled to damages (to compensate him for harm to his dignity and reputation) and injunctive relief. Unless otherwise indicated, the narrative recounted below is drawn from undisputed facts appearing in the parties' briefing.[1]

On February 14, 2019, McLean County Sheriff's deputies responded to a call for service at the home shared by Plaintiff; his then-girlfriend, Autuam Scheel; and another woman, Nicole Allen. The home was owned by Scheel's stepfather, Robert Nichols.[2] Deputies arrested both Plaintiff and Scheel and questioned them and Allen about their altercation. The next day, both Plaintiff and Scheel were released without having been charged in connection with the February 14 incident.

---

[1] Although Plaintiff originally filed claims related to arrests in both 2016 and 2019, the claims pertaining to the 2016 incident have been dismissed, and Plaintiff's inclusion in his Motion of allegations and evidence related to the 2016 arrest can serve only to assist his claim that Defendant has engaged in a pattern of discriminatory conduct. Likewise, his reference to a 2020 traffic stop is relevant only to the issue of damages, in that Plaintiff claims the inclusion in the police report from that stop of a reference to Plaintiff's association with drugs and weapons is proof that he now has a negative reputation thanks to his 2019 arrest. (Doc. 65 at 12). As will become clear in the remainder of this Opinion, it is not necessary for the Court to reach either point, and so for simplicity's sake, narration of the 2016 and 2020 incidents has been omitted.

[2] Both parties alternately refer to Scheel as "Autuam Scheel" and "Autumn Scheel." On the McLean County Circuit Clerk's website, identical court records are available under the names "Autuam Scheel," "Autom Scheel," and "Autumn Scheel." It is unclear which is Scheel's legal first name. The Court refers to her as "Autuam Scheel" (the name on the subpoena issued to her on Sept. 7, 2022) and thereafter "Scheel." Likewise, Scheel's stepfather is referred to in some places in the briefing and the record as "Robert Nichols" and in others as "Robert Nicholas." As it does not have an independent basis for determining which is the correct spelling, the Court will refer to him as "Nichols."

2

On February 15, while Scheel was still in custody, her stepfather arrived at the building shared by the McLean County Sheriff and the Bloomington Police Department (BPD) to report that he had gone into the trailer in which Plaintiff, Scheel, and Allen lived and had found a gun and ammunition under the bed his stepdaughter shared with Plaintiff. Detective Aaron King, an employee of the McLean County Sheriff, spoke to Nichols and then questioned Scheel about the firearm. Scheel told King that Plaintiff had shown her the gun and ammunition about two months before, in December of 2018. King asked her if she wanted the weapon in her home; she replied that she did not. Scheel then gave consent for deputies to search the trailer. Deputy Brandon Jones did so, finding the gun and ammunition and bringing them into headquarters.

Meanwhile, as Plaintiff was leaving the building, having been released after his night in the jail due to the February 14 altercation, King approached him. Plaintiff contends King forced him to accompany him to an interview room, where he was interrogated behind a locked door for several hours; King, on the other hand, wrote in his incident report and repeated in his sworn declaration that he asked Plaintiff if he would be willing to answer some questions and that Plaintiff agreed to go with him.

At first, Plaintiff denied possessing any weapon besides a BB gun, but upon being told the gun had been located, he admitted he was holding it for a friend, Ricky Devoe. He then asked King if he was being detained; King stated, "at this time he

was detained for possession of a firearm without a FOID." (Doc. 61 at 9). King asked Plaintiff for permission to search the home, but Plaintiff refused.

Once Jones had returned to the law enforcement building with the firearm and ammunition, deputies ran a check and determined both had been stolen in the same Bloomington burglary. Because the BPD was the agency investigating that crime, deputies contacted the BPD's Detective Steve Moreland and apprised him of the situation. Moreland interviewed Plaintiff, obtained similar answers to King's, then placed him under arrest and had him transferred to the county jail. Next, Moreland spoke to Scheel, who told him she believed Devoe had taken the gun back and that it was no longer in the trailer. She also admitted she had once held the gun.

Allen also gave a statement about the firearm that day. She told King she found out about the gun about two weeks prior, when Scheel told her it was in the home but did not show it to her or tell her where it was located. Allen was not detained; she answered questions and then left the building voluntarily.

At some point on February 15, Scheel was released from custody with no charges having been filed with respect to either the domestic battery or the firearm. Neither Scheel nor Allen was ever charged in connection with the weapon. Plaintiff was charged with unlawful possession of a firearm without a valid FOID card, a Class A Misdemeanor under Illinois law. 430 ILCS 65/2(a)(1). He subsequently pled guilty to this charge.

One point relating to these facts is worth special emphasis given the history of this action. In the Complaint and throughout the dismissal stage, Plaintiff alleged

4

that the McLean County Sheriff was the law enforcement agency that arrested him, and his claims regarding the February 15, 2019, incident focused on the arrest itself (and the fact that neither Scheel nor Allen was arrested). (Doc. 1 at 7). During his deposition, Plaintiff admitted that the Bloomington Police Department was the actual arresting agency. Plaintiff attempted, too late, to amend his complaint after the close of discovery to add the BPD and the arresting officer, Moreland, to the suit; this Court denied his motion. (Doc. 72). As a result, Plaintiff describes in his current Motion for Summary Judgment (doc. 63) a theory that has been materially altered by comparison to his Title VI claim in the Complaint: He alleges that employees of the McLean County Sheriff conspired with the BPD to effectuate his arrest in furtherance of a policy of the Sheriff (and the BPD) to treat black suspects less favorably than white ones. (Docs. 63 at 3, 63-1 at 1, 77 at 7). However, at other points in his filings, he focuses not on the formal arrest itself, but on his and Scheel's treatment by King before Moreland arrived. (Doc. 68 at 4, 15–16). In his version of events (which Defendant in part disputes), King forced him to go with him to answer questions about the gun, informed him he was being detained, and locked him in an interrogation room, whereas Scheel was not detained for questioning. These allegations do not depend on showing that the two law enforcement agencies conspired together to arrest Plaintiff, or that Defendant "directly caused" the BPD to arrest Plaintiff. (Doc. 63 at 4).

In the interest of liberality toward a party proceeding without representation, the Court will consider both theories, even though they are plainly novel

5

accommodations to Plaintiff's inability to sue the true arresting agency; however, Plaintiff must still meet the summary-judgment standard in order to prevail at this stage or proceed to trial.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmovant bears the burden of demonstrating that such genuine issue of material fact exists." *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018). "The parties must support their assertions that a fact is disputed or cannot be genuinely disputed by citing to admissible evidence in the record." *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment…. [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248.

The record is viewed in the light most favorable to the nonmovant, and the Court must draw all reasonable inferences from the evidence in the nonmovant's favor. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529, 536 (7th Cir. 2018). When presented with cross-motions for summary judgment, the Court must consider the motions separately, which necessarily means the nonmovant differs depending on the motion being considered. *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). This, however, does not alter the standard for reviewing a motion for summary judgment or the parties' respective burdens.

Plaintiff here is proceeding *pro se*, while Defendant is represented. While "there are no exemptions from the requirements of Rule 56 under the Federal Rules of Civil Procedure," *Thomas v. Meister Heating & Air Conditioning, Inc.*¸ No. 03-1038, 2006 WL 898144, at *2 (C.D. Ill. Apr. 6, 2006), "[a]llegations in pro se pleadings are to be construed liberally, applying substantially less stringent standards than those applied to pleadings drafted by professional counsel." *Kincaid v. Vail*, 969 F.2d 594, 598 (7th Cir. 1992).

## DISCUSSION

### I.   Disputed Facts

Both parties have moved for summary judgment. According to the logic of Rule 56, this should mean both agree on a set of undisputed facts and disagree only on which side should prevail on the law. In reality, the parties disagree to a significant extent about what happened in February 2019. However, almost all of these differences are immaterial (e.g., whether or not Allen pushed Plaintiff during the

domestic altercation for which he was arrested on February 14 (doc. 68 at 8)—an arrest that is not at issue here), constitute conclusions of law (e.g., " 'Patterson, compared with others similarly situated, was [not] selectively treated,' Plaintiff disputes" (doc. 68 at 3); or are not supported by citations to the record as required by Rule 56 and Local Rule 7.1(D), for example, Plaintiff's contention that King "detained" him upon finding him in the lobby of the sheriff's building, followed by a citation to an incident report that says no such thing (docs. 68 at 4, 61-2 at 13).

The briefing of the parties' motions reveals only one fact that may be in dispute and material to the resolution of the case: whether or not Scheel was in custody while being questioned about the firearm on February 15. Plaintiff's Motion states it is undisputed that Scheel was not detained, arrested, or charged in connection with the gun (doc. 68 at 2) and, furthermore, that McLean County Sheriff's personnel never locked her in a room in connection with suspected firearm violations (doc. 68 at 3, 4, 11). Defendant, meanwhile, identifies this as a disputed material fact and contends that Scheel was still in custody pursuant to her battery arrest from the night before and continued to be in custody while she was interviewed about the gun. (Doc. 61 at 6–7).[3]

---

[3] The parties also disagree about when Plaintiff was detained in connection with the investigation of the firearm in the trailer; Defendant lists as an undisputed fact that King asked Plaintiff to answer some questions and that he did so voluntarily, after having been released without charges on the domestic violence incident (doc. 61 at 8), while Plaintiff claims it is equally undisputed he was forced into a locked room for questioning about the weapon (doc. 67 at 4). But regardless of whether Plaintiff voluntarily followed King to the interview room, the parties agree (based on King's report) that once he was there, he asked King if he was being detained, and King replied that he was. (Doc. 61 at 9). At that point, a reasonable person would conclude he was not free to leave (whether or not the door was

This point matters because as part of his intentional discrimination claim under Title VI, Plaintiff must demonstrate that non-black comparators were similarly situated to him yet were treated differently by Defendant. Unless he can prove a conspiracy between Defendant and the BPD (as discussed below), he cannot rely on the fact that he was ultimately arrested and charged while his roommates were not, because Defendant did not take those actions; the BPD did. He can only argue their treatment was different (and that difference was motivated by deliberate racial bias) before the BPD took over the investigation. If Scheel, like Plaintiff, was detained in a locked room while being questioned about the gun, then she and Plaintiff were not treated differently by Defendant (the sheriff's office), and the only difference in the ultimate disposition of their respective cases was the decision of the BPD (not a defendant here) to arrest and book Plaintiff and not Scheel.[4] Plaintiff would then be able to use only Allen as a comparator, since the parties agree Allen was never detained.

The summary-judgment standard requires a party to cite a particular portion of the attached record in support of an allegation that a fact either is or is not genuinely in dispute. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the party may "show[] that the materials cited do not establish the absence or presence of a genuine dispute,

---

actually locked at the time). Furthermore, the parties agree that Allen was not detained during questioning and was at all times free to leave. Thus, the only fact genuinely in dispute is Scheel's freedom of movement during questioning.

[4] The record does not indicate who made the decision not to arrest and charge Scheel, whether sheriff's deputies consulted with Moreland or other BPD officers about that decision, or at what point in the day she was allowed to leave. However, it is undisputed that she was released from custody on February 15, 2019, and was never charged with possessing a firearm without a FOID card.

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). In support of its statement that Scheel continued to be in custody during questioning, Defendant cites King's declaration (Doc. 61-2 at 2); this is consistent with his probable cause statement and supplemental incident report on the subject (Doc. 61-2 at 13, 17). These documents state that correctional officers brought Scheel to the interview room where King spoke with her; while the record does not clearly state that she continued to be detained after King concluded his questioning, it would be reasonable to assume she was not given the option of leaving the building while deputies waited for Moreland to arrive, and Plaintiff does not contest this particular point.

In fact, Plaintiff cites no materials that offer any support to his assertion that Scheel was not in custody during the February 15 interrogation; his only attempt to do so is a reference to an admission in which Defendant concedes Scheel was never arrested on weapons charges—not that she was never detained that day. (Doc. 68 at 2). Inasmuch as Plaintiff threads the needle at times by stating Scheel was not detained "for FOID violations" (doc. 68 at 3), the distinction is semantic and meaningless, since she could not have been detained again (other than by being arrested on new charges) when she was already in custody. The reason (whether the previous night's arrest, or suspicions about her involvement with the gun Nichols found) is immaterial; if Scheel was in custody during questioning as Defendant avers, then she and Plaintiff were subject to identical conditions: confined in a room and not free to leave.

In its Reply, Defendant identifies Scheel's status as a disputed, material fact (doc. 76 at 4)—even though by filing a motion for summary judgment, it had posited that no such facts existed. However, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Since Plaintiff has introduced no evidence from the record that Scheel was not in custody, nor explained how the materials Defendant cites fail to establish this fact, the Court deems it undisputed that Scheel was not free to leave while being questioned about her knowledge of the firearm.

Because there are no material facts in genuine dispute, no question of fact remains for the jury, and the Court now turns to the question of which party must prevail as a matter of law. The answer depends on whether Plaintiff has made out a case that Defendant violated Title VI.

## II.    The Prima Facie Case Under Title VI

### A.    *Recipient of Federal Funding*

Title VI applies only to recipients of federal funding. 42 U.S.C. § 2000(d). As long as some program or activity conducted by the defendant entity receives such funds, the entity must comply with Title VI in "all of [its] operations." 42 U.S.C. § 2000d-3(A)(ii). Some courts still repeat (as does Defendant) the mantra that the plaintiff "must be the intended beneficiary of the federal spending program" that brought the defendant within the scope of Title VI. *See, e.g.*, *Brown-Dickerson v. City of Philadelphia*, WL1623438, *8 (E.D. Pa. 2016). However, in noting that statutory

11

changes enacted in 1987[5] abrogated *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226 (7th Cir. 1980), the Court of Appeals for the Seventh Circuit made explicit that the new law expanded not only the scope of Title VI liability for defendants, but also the class of potential plaintiffs with standing. *T.S. by & through T.M.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 746 (7th Cir. 2022) ("After the CRRA was passed, a plaintiff who had not been able to sue . . . because he was not an intended beneficiary of the specific program or activity receiving federal financial assistance now could sue.")

The change does not render the plain language of Title VI meaningless; the law still protects only those who are participants in, applicants to, or beneficiaries of the overall entity that operates a program receiving federal funds. But it does relieve the plaintiff of the burden of establishing a strict nexus connecting the precise purpose of the federal assistance, the alleged discrimination, and the plaintiff himself. During the episode he complains of, Plaintiff was an arrestee who ultimately pled guilty to criminal conduct, yet he remained a resident of McLean County and member of the public able to avail himself of (and potentially benefit from) the protection of its law enforcement functions. This likely suffices in the post-1987 Title VI landscape. *See, e.g., Epileptic Foundation v. City and Cty. of Maui*, 300 F. Supp. 2d 1003, 1012–13 (D. Hawai'i 2003) (finding plaintiffs established they were beneficiaries of federal funding by stating they were local residents seeking to use the parks operated by defendant grantees).

---

[5] Pub. L. No. 100-259.

Here, Plaintiff makes the bare assertion that "[a]s a resident of McLean County, Plaintiff is an intended beneficiary of any funds the McLean County Sheriff's Department receives." (Doc. 77 at 8). He attaches to his Reply an intergovernmental agreement among the Town of Normal, the City of Bloomington, and McLean County to reallocate funds received from the federal government through the Byrne Justice Assistance Grant Program, finding "that the undertaking will benefit the public." (Doc. 77 at 14).

Defendant does not dispute the fact that it receives federal funds but argues Plaintiff does not sufficiently identify the source and purpose of those monies, explain why he is an intended beneficiary, or establish a "logical nexus" as required by Section 604 of Title VI. (Doc. 67 at 12–13). But Section 604 only applies to claims of employment discrimination, and Defendant holds Plaintiff to a more demanding standard than currently exists in this circuit. Particularly given that Plaintiff is unrepresented, the Court finds he has adequately alleged the first prong of a prima facie case under Title VI: that Defendant is a recipient of federal assistance.

B.    *Intentional Discrimination*

The applicable portion of Title VI of the Civil Rights Act of 1964 states as follows: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). While this provision is typically enforced through the withdrawal of federal funding from a recipient that has persisted in violating its terms, it may also give rise to a private right of action brought by an individual who has suffered

13

exclusion, denial of benefits, or discrimination. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 686 (1979). When an individual brings suit against a funding recipient, he or she is limited to suing under the statute itself, not the anti-discrimination regulations promulgated under Title VI's authority to govern federal grantees' conduct, and for that reason, the Title VI plaintiff may recover only for acts of intentional discrimination, not policies or practices that have a racially disparate impact but no requisite intent. *Alexander v. Sandoval*, 532 U.S. 275 (2001).

The defendant who has intentionally discriminated against a plaintiff has "acted with a discriminatory purpose and discriminated against him because of his membership in an identifiable group." *Dunnet Bay Const. Co. v. Borggren*, 799 F. 3d 676, 697 (7th Cir. 2015). The bar a plaintiff must clear to survive summary judgment in these cases has been described thus:

> To establish a genuine issue of material fact that the defendants intentionally discriminated against Plaintiff's son on the basis of his race, Plaintiff must demonstrate that the decision to exclude [her son] from a federally financed program was motivated by race and that his race was a determining factor in the exclusion. . . . It follows that where the decisionmaker is motivated by a factor other than the excluded party's race, there can be no intentional discrimination.

*Buchanan v. City of Bolivar, Tenn.*, 99 F. 3d 1352 (6th Cir. 1996).

There are two ways in which a plaintiff suing under Title VI may prove the defendant intended to discriminate: direct and indirect.

### 1.  Direct Method of Proof

A defendant may overtly manifest a discriminatory motivation through direct evidence of such intent: words and other expressions readily understood to describe animus toward the protected group and an intent to treat members of it unfavorably.

*Sirpal v. University of Miami*, 509 Fed. Appx. 924, 926 (11th Cir. 2013). A "facially discriminatory policy" (i.e., a policy that explicitly treats a protected group differently) may also serve as direct evidence of discrimination. *Cmtys. for Equity v. Michigan High Sch. Athletic Ass'n*, 459 F. 3d 676, 694 (6th Cir. 2006). Defendant finds in the record no evidence that the McLean County Sheriff or any of his agents made racially derogatory remarks, commented on Plaintiff's race (or, for that matter, Scheel's or Allen's race), or maintained an express policy of treating black and white suspects differently from one another. (Doc. 61 at 18). Plaintiff does not contest this.

### 2.  Indirect Method of Proof

If no direct evidence of the decisionmaker's motive is available, the plaintiff may use an indirect method of proof. This framework, originally established in the context of employment law, also applies to Title VI discrimination suits. *Brewer v. Bd. of Trustees of University of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007); *see McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff must make out a prima facie case: 1) that he is a member of a protected class, 2) that the defendant took an adverse action against him, and 3) "that similarly-situated non-class members were treated more favorably than he." *Id.* at 915. Once these elements are established, the evidentiary burden shifts to the defendant to put forth a nondiscriminatory reason for the adverse action. *Id.* If the defendant does so, then the plaintiff must show that this reason is merely pretextual—in other words, that the defendant's true motive for taking the action was discriminatory. *Id.*

Plaintiff's attempt to prove intentional discrimination indirectly must proceed differently for each of his theories: first, that Defendant conspired with the BPD to

15

arrest him or directed the BPD to make the arrest (and thus that the arrest itself can be imputed to Defendant); and second, that even if Defendant was not responsible for his arrest and Scheel's release, their treatment of the three roommates before the BPD arrived on the scene was disparate and discriminatory. The conspiracy allegation is considered first.

According to this theory, Defendant and the BPD have the same discriminatory policy of arresting black persons and allowing white persons who have committed the same offense to go free. (Doc. 63-1 at 1–2). At various points, Plaintiff alleges that King knew Moreland would wrongfully arrest him and failed to stop him from doing it (doc. 77 at 8), that Defendant caused Plaintiff to be arrested by the BPD (doc. 63 at 4), and that sheriff's deputies worked hand in hand with Moreland to arrest and charge Plaintiff while releasing Scheel (doc. 68 at 15–16). It is unnecessary to examine the other elements of indirect proof on the theory that Plaintiff's arrest can be imputed to Defendant, because Plaintiff simply offers no evidence to back up his story: no evidence that the two agencies share a racially discriminatory policy, no evidence that King told Moreland to arrest Plaintiff, and no evidence that any sheriff's deputy discussed with any BPD officer a plan to charge Plaintiff and not his roommates. While Defendant cannot prove a negative, it offers proof that Moreland did not review King's interviews before talking to the suspects (doc. 61 at 11), along with a reasonable explanation for the coordination that did take place between the two agencies: once Jones checked the gun and ammunition found in Plaintiff's home using the LEADS database, he discovered they had been stolen in a burglary the BPD

16

was actively investigating. Plaintiff does not dispute this was the case. Thus, the Court proceeds on the assumption that there was no conspiracy and no shared policy. To prevail, Plaintiff must show the adverse actions he suffered at the hands of Defendant (not his arrest by the BPD) were motivated by an intent to discriminate.

Plaintiff has established he is a member of a protected class based on his race; he is black, and Defendant admits at all times its personnel knew him to be black and Scheel and Allen to be white. He has also shown he suffered an adverse action: Defendant detained him for questioning. The final step is more complicated. It first hinges on the question of whether Scheel and Allen were "similarly situated" to Plaintiff, yet treated differently.[6]

As discussed *supra*, Defendant's conduct towards Plaintiff and Scheel in the matter of the stolen gun was virtually identical. Both were detained for questioning, with the only distinction being that Plaintiff had already been released before King questioned him about the firearm, while Scheel had not yet been released after her February 14 arrest and was still in custody. Neither was free to leave while King conducted his interviews concerning the weapon found in their home. Nor does Plaintiff assert his treatment while in detention was worse than Scheel's; while he states in his declaration that he was sleep-deprived and thirsty during the interview, he offers no evidence Scheel was not in a similar state of distress. Thus, Scheel fails

---

[6] Although his focus is typically his roommates, Scheel and Allen, Plaintiff also states at times that Ricky Devoe, Joel Long, and Robert Nichols were similarly situated to himself with respect to the gun at issue. (Doc. 63-1 at 2–4). Defendant offers ample argument as to why they were not, and Plaintiff fails to rebut it. The record reflects that the BPD, not Defendant, investigated and interviewed Devoe and Long. And Nichols' contact with and knowledge of the firearm was limited to finding it under the bed, placing it on top of the bed, and immediately contacting law enforcement. Only Scheel's and Allen's situations are similar enough to Plaintiff's to warrant further discussion.

as a comparator to Plaintiff—not because she was not similarly situated, but because she was subjected to the same adverse actions of Defendant.

This leaves Allen, who was not detained while King questioned her about the gun. Plaintiff states (and Defendant does not dispute) that like himself, Allen lived in the trailer home during the time the gun was also located there, knew at some point that the firearm was in the home, and did not hold a valid FOID card. (Doc. 63-1 at 4–5).

Defendant, asserting a nondiscriminatory reason for the disparate treatment, counters that there were relevant differences between the two women's relationship to the firearm and Plaintiff's. (Doc. 68 at 14). Only Plaintiff affirmatively agreed to possess the gun and bring it into the home. While Scheel and Allen eventually learned of the gun's presence, it was not their decision to keep it on the property, nor is there evidence before the Court that Plaintiff asked their permission to store it there. The February 15 interviews determined neither had actual knowledge that the gun was still in the home at all; in fact, Scheel indicated she believed Patterson and Devoe had sold it to a third party. Allen, the remaining comparator, learned of the gun secondhand, and there is no evidence she ever saw it or handled it. Plaintiff, by contrast, eventually admitted to King that he knew the firearm was still under the bed in the trailer.

Nevertheless, Plaintiff argues against the significance of the factual differences between himself and Allen, citing cases in which convictions for possession of a firearm were upheld even where a housemate or guest shared control

18

over the contraband with the primary occupant. (Doc. 63-1 at 4–6). He misunderstands what he must do in order to prove Defendant's rationale was a mere pretext. His task is not to demonstrate that Allen hypothetically could have been convicted of a crime, but instead to show that a law enforcement agency's decision *not* to detain them in connection to that offense violated Plaintiff's civil rights. To defeat Defendant's Motion, he must show that a reasonable jury could find Defendant's rationale so absurd that it must have been an after-the-fact rationalization of Defendant's true motivation: racial animus.

Plaintiff fails to achieve this logical leap. It is axiomatic that law enforcement officers do not arrest everyone whose conduct offers probable cause they might have committed a crime. They may conserve resources, prioritizing more serious offenses and the arrest of individuals who seem, based on their investigation and factors such as those Defendant describes, to bear a greater degree of responsibility or pose a higher degree of risk to the community than others. Recognizing this, courts have held time and again that there is no private right against the government to have the law enforced. *See, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) (holding there is no entitlement to (and thus no due-process property right in) the enforcement of the law because law enforcement agencies possess discretion as to when and how to undertake enforcement activities). A corollary of this principle must surely be that the criminal offender possesses no right to have all others who may have violated the same law detained, questioned, arrested, or charged in exactly the same manner as himself.

Plaintiff's right under Title VI is only to be free from intentional racial discrimination. And while "[a] selective enforcement claim does not require proof that the plaintiff was arrested without probable cause," the plaintiff still must demonstrate "that the officer exercised his or her discretion to enforce the laws on account of the plaintiff's race, nationality, or other characteristics." Here, Plaintiff falls far short of proving that Defendant's actions—detaining him for questioning, referring the investigation to the BPD, and allowing Allen to leave after giving her statement—were motivated by such intent, even if it is possible Allen's conduct also violated state law.

The Court recognizes the wide discretion afforded law enforcement offers an opportunity for racially selective enforcement, which can be notoriously difficult to prove and remedy. *See generally* Guy Rubinstein, *Selective Prosecution, Selective Enforcement, and Remedial Vagueness*, 2022 Wis. L. Rev. 825, 829–33 (2022). Here, though, with no direct evidence of discriminatory intent, a defendant that was not the arresting agency, and significant distinctions between Plaintiff and the relevant white roommate with respect to their involvement in illegal activity, the connection is simply too attenuated to permit a reasonable jury to return a finding of selective enforcement or discriminatory treatment on the basis of race.

The parties also address the question of whether a "decisionmaker" with "final policymaking authority" within the office of the McLean County Sheriff knew about or approved an intentionally discriminatory policy or pattern of conduct. (Docs. 67 at 14, 77 at 6). Because the Court finds no intentional discrimination in the incident

that is the subject of the claim, either by the office itself or any of its employees, it does not reach this issue.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (doc. 63) is DENIED, and Defendant's Motion for Summary Judgment (doc. 61) is GRANTED. All issues having been disposed of, the case is TERMINATED.


SO ORDERED.

Entered this 17th day of March 2023.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
